# COURT OF APPEALS
## DECISION
## DATED AND FILED

## October 26, 2021

**Sheila T. Reiff**
**Clerk of Court of Appeals**

## NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.**     **2021AP1278**
                   **2021AP1279**
                   **2021AP1280**
**STATE OF WISCONSIN**

Cir. Ct. Nos.  2020TP44
                   2020TP45
                   2020TP46

## IN COURT OF APPEALS
## DISTRICT I

---

IN RE THE TERMINATION OF PARENTAL RIGHTS TO P.G., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

             PETITIONER-RESPONDENT,

     V.

S.T.,

             RESPONDENT-APPELLANT.

---

IN RE THE TERMINATION OF PARENTAL RIGHTS TO J.G., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

             PETITIONER-RESPONDENT,

     V.

S.T.,

---

RESPONDENT-APPELLANT.

IN RE THE TERMINATION OF PARENTAL RIGHTS TO J.G., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

PETITIONER-RESPONDENT,

v.

S.T.,

RESPONDENT-APPELLANT.

APPEALS from orders of the circuit court for Milwaukee County: MARSHALL B. MURRAY, Judge. *Affirmed*.

¶1 BRASH, C.J.[1] S.T. appeals the orders of the trial court terminating her parental rights to P.G., Jr., and twins J.G. and J.G. She argues that the trial court erred in admitting evidence regarding the termination of her parental rights to two of her other children, which occurred prior to the birth of the three children involved in this matter. Upon review, we affirm.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

## BACKGROUND

¶2 S.T. is the biological mother of P.G., Jr., born in May 2017, and twins J.G. and J.G., who were born in April 2018. The parental rights of the children's father, P.G., were also terminated under the orders that underlie this appeal.[2]

¶3 The children were detained by the Division of Milwaukee Child Protective Services (DMCPS) in September 2018 after S.T. brought one of the twins to the emergency room at Children's Hospital with severe burns over "a significant portion" of his body. S.T. explained that she had left the child in the bathtub with the water running, and when she came back she realized the water was too hot. Hospital staff noted that this story did not make sense, as only one of the child's legs was burned, as opposed to both legs. It was also noted that at the time, the child was only five months old and unable to sit up on his own, so it was not clear how he would have been able to sit in the bathtub alone. Furthermore, a relative of S.T.'s who provided them with transportation to the hospital told the staff there that S.T. had contacted her at 2:30 p.m. that day and had sent her a photograph of the twin's burn at that time, but S.T. told the hospital staff that the incident had occurred at 6:30 p.m.

¶4 The hospital staff also noted that S.T. is "cognitively delayed," and therefore her explanation of the incident was hard to follow as her "ability to provide a clear history" was "limited[.]" For example, she later indicated that she had not left the twin alone in the bathtub; instead, she said that she had put him in

_____

[2] P.G. is the adjudicated father of P.G., Jr. and the biological father of the twins. P.G. is also appealing these orders terminating his parental rights in a separate case.

the bath without first checking the temperature of the water. When he started "fussing," she took him out and noticed that his skin was blistering, but she did not think that the burn was significant; thus, instead of taking him to the hospital immediately, she applied cream to the burn and gave him ibuprofen. However, the skin where the burn occurred was described as "blackened, blistered, and peeling," and required surgery.

¶5 The three children were removed based on the potential for further "dangerous incidents" that could cause them harm, and petitions for protection or services (CHIPS) was filed.[3] The children were placed in foster care as opposed to being placed with P.G. because it was suspected that P.G. also has cognitive delays, and further, at that time P.G. had an open case in Milwaukee County for disorderly conduct related to a domestic abuse incident occurring in August 2018.

¶6 Moreover, S.T. has an extensive history with DMCPS. Approximately ten years prior to this case, S.T. had another child who was removed from her custody after suffering first and second-degree burns for which S.T. did not seek medical care; as a result, S.T.'s parental rights to that child and another child were terminated in 2008. S.T. also had two children die of suffocation from co-sleeping, at different times, with one of those deaths considered "suspicious[]." Additionally, she had another child who was stillborn.

---

[3] Another child of S.T.'s, S., who was born in 2010, was also removed from S.T.'s custody at that time. However, S. was not included in the orders terminating S.T.'s parental rights which underlie this appeal; rather, a transfer of guardianship of S. was pending at the time of these proceedings.

¶7  Furthermore, there were also current contacts with S.T. by DMCPS prior to the twin being burned.  Because the twins were born prematurely, they have medical conditions, including gastrointestinal issues, which were being monitored by DMCPS; additionally, all three children have chromosomal abnormalities that could result in problems with their vision, which also require regular clinical appointments.  DMCPS was contacted in June 2018 after S.T. missed two medical appointments for the twins and could not be contacted, and again in July 2018 when it was reported that she was feeding the twins improperly and they were "failing to thrive" due to their problems swallowing.  She was also apparently failing to clean the bottles between feedings.

¶8  Dispositional orders relating to the CHIPS petitions were entered in June 2019, listing a number of requirements that had to be met by S.T. and P.G. before the children could be returned to their care.  Those requirements for S.T. included resolving her criminal case—she had been charged with felony child neglect causing great bodily harm after the incident with the twin being burned[4]— and committing no further crimes.  It was also required that S.T. show that she could provide a safe home for the children and properly care for them. Additionally, there was a requirement for regular visitation with the children.

¶9  S.T. failed to meet these conditions.  Despite the parenting classes and services provided to S.T. through DMCPS, S.T. has "significant cognitive deficits," as indicated in a psychological evaluation performed for these proceedings, which "impair her ability to safely care for her children" and "place

---

[4] S.T. was ultimately found not guilty of that crime due to mental disease or defect and placed in community supervision for five years.

her children at risk." Furthermore, although S.T. consistently visited the children, she always "need[ed] a lot of help" from her case worker during visits, and sometimes did not engage with the children at all. Thus, she was never able to move beyond supervised visitation.

¶10 As a result, petitions for the Termination of Parental Rights (TPR) of S.T. and P.G. with regard to P.G., Jr., J.G. and J.G. were filed in February 2020. In the TPR petitions, the State's alleged grounds for termination included the continuing need of protection or services for the children, pursuant to WIS. STAT. § 48.415(2), and the failure of S.T. and P.G. to assume parental responsibility, pursuant to § 48.415(6).

¶11 A court trial regarding the grounds phase of the TPR proceedings was held in February 2021. During the State's direct examination of S.T.'s case manager, the State inquired as to whether S.T. had ever been involved in CHIPS or TPR proceedings with any of her other biological children, and whether her parental rights as to any of those children had been terminated. Counsel for S.T. objected to the question on the grounds of relevance, but the trial court overruled the objection and allowed testimony regarding the issues involving S.T.'s other children, as described above. It was pointed out that those incidents occurred prior to the birth of the children who are the subjects of these TPR orders. However, the case manager explained that due to S.T.'s cognitive issues, she has only an "incident-based understanding" of those situations, and that it is "difficult for her to apply previous experiences and learn from them and apply them to future situations."

¶12    Ultimately, the trial court determined that the State had proven both grounds set forth in the TPR petitions, and that it was in the best interest of the children that S.T.'s parental rights be terminated.  This appeal follows.

**DISCUSSION**

¶13    S.T. argues that the trial court's decision to admit the evidence regarding her other children was erroneous because that evidence was not relevant to the current proceedings.  "We review a trial court's decision to admit or exclude evidence in a termination trial under the erroneous exercise of discretion standard."  *State v. Quinsanna D.*, 2002 WI App 318, ¶19, 259 Wis. 2d 429, 655 N.W.2d 752 (some formatting altered).  Furthermore, the "ultimate determination of whether to terminate parental rights" is also a discretionary decision that lies with the trial court.  *State v. Margaret H.*, 2000 WI 42, ¶27, 234 Wis. 2d 606, 610 N.W.2d 475.  The trial court erroneously exercises its discretion "if it does not examine the relevant facts, applies the wrong legal standard, or fails to use a demonstrated rational process to reach a reasonable conclusion."  *Brown Cnty. v. Shannon R.*, 2005 WI 160, ¶37, 286 Wis. 2d 278, 706 N.W.2d 269.

¶14    Specifically, S.T. points to a comment made by the trial court during the course of making its findings:

> I want to step aside for a moment because I neglected to mention that I don't know how [S.T.] has dealt with the trauma that has happened in her life just surrounding her children … the trauma of losing two children during the child or children's sleeping, co-sleeping and passing away, losing two children via TPR, termination of parental rights, another child under a guardianship…. [I]t's … clear to me that [S.T.] has struggled for obvious reasons with the care and protection of her children.

S.T. asserts that this evidence referenced by the trial court is not relevant in determining whether she met the conditions set forth in the current CHIPS orders relating to the children involved in this matter.

¶15    Indeed, in making its determinations on a TPR petition, particularly with regard to the ground of failure to assume parental responsibility, a court "must look to the totality of the circumstances" of the "relevant time period"; in other words, "the circumstances that have occurred over *the entirety of the child's life*." ***Tammy W.-G. v. Jacob T.***, 2011 WI 30, ¶22, 333 Wis. 2d 273, 797 N.W.2d 854 (emphasis added).  Obviously, the incidents involving S.T.'s other children did not occur during the lifetimes of P.G., Jr., J.G., and J.G.

¶16    However, in reviewing the full context of the trial court's comments, they were made as part of a broader discussion regarding S.T.'s argument during the proceedings as to whether the efforts and services offered by DMCPS to S.T. were "reasonable" under the circumstances.  The trial court found that DMCPS had in fact acted reasonably in providing services to S.T., but that due to her "extremely low intellectual ability," S.T. was not able to modify her behavior sufficiently to demonstrate that she could care for the children if they were returned to her.[5]  The court contemplated whether S.T.'s failure to comprehend the extent of the burns to the twin was due in part to a "protection mechanism"

---

[5] It was noted by counsel for S.T. that although S. was removed from S.T.'s custody at birth, she was subsequently reunified with P.G. and S.T. in 2011, prior to the births of P.G., Jr., J.G., and J.G.  The case manager was not aware of any interventions by DMCPS involving S. in the time frame between reunification and the births of P.G., Jr., J.G., and J.G.  In its decision, the trial court acknowledged this information relating to S., but stated that it did not "know the context of that return," and that, in any event, it was not sufficient to outweigh the other evidence in this matter regarding S.T.'s difficulties in caring for her children.

resulting from those previous traumatic experiences with her other children. Nevertheless, the court ultimately found that because of S.T.'s cognitive disabilities, she "doesn't have the ability to meet the conditions" of the CHIPS orders.

¶17     For purposes of this analysis, we note that "relevant evidence" is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." WIS. STAT. § 904.01. Generally speaking, relevant evidence is admissible, but it may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice" or if its admission could cause "confusion of the issues[.]" WIS. STAT. §§ 904.02, 904.03.

¶18     Here, because S.T. opted for a court trial, the evidence was presented to the trial court—which has a clear understanding of the standard to be applied in these matters—as opposed to being presented to a jury as the fact finder; as a result, there was a diminished risk of the evidence leading to confusion of the issues or unfair prejudice. *See id.* Furthermore, the trial court's determination in this case focused on S.T.'s cognitive disabilities and her lack of ability to learn from previous experiences. Thus, the evidence regarding her other children was relevant in this matter. *See* WIS. STAT. § 904.01. Therefore, the trial court did not err in allowing it to be admitted. *See **Shannon R.***, 286 Wis. 2d 278, ¶37.

¶19     However, even if we were to conclude that this evidence was admitted erroneously, the error was harmless. "An evidentiary error is subject to a harmless error analysis and requires reversal or a new trial only if the improper admission of evidence has affected the substantial rights of the party seeking relief." ***State v. Britt***, 203 Wis. 2d 25, 41, 553 N.W.2d 528 (Ct. App. 1996).

Under this test, this court "will reverse only where there is a reasonable possibility that the error contributed to the final result." *Id.*; *see also* **State v. C.L.K.**, 2019 WI 14, ¶¶39, 90, 385 Wis. 2d 418, 922 N.W.2d 807 (Roggensack, C.J. and Ziegler, J., dissenting). This analysis "presents a question of law for our independent review." **State v. Nelson**, 2014 WI 70, ¶18, 355 Wis. 2d 722, 849 N.W.2d 317.

¶20 In making the determination regarding whether an error is harmless, "we weigh the effect of the inadmissible evidence against the totality of the credible evidence supporting the verdict." **Britt**, 203 Wis. 2d at 41. Here, there was ample evidence in the record regarding S.T.'s cognitive disabilities which result in her need for constant parenting assistance and her limited ability to develop independent parenting skills, as well as evidence relating to the extensive burn that was suffered by one of the twins while he was in S.T.'s care. Therefore, we conclude that the evidence relating to S.T.'s other children did not contribute to the trial court's final determination in this matter. *See* **id.** As such, any error in admitting the evidence relating to the older children was harmless.

¶21 Accordingly, we affirm the trial court's orders terminating the parental rights of S.T. to P.G., Jr., J.G., and J.G.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.